Thank you, Your Honor. Good morning, and may it please the Court, my name is Brad Denton. I represent the Plaintiff and Appellant, Tresona Multimedia, LLC. I'd like to reserve five minutes, please, of my argument. Could you move the microphones up and speak a little louder? Yes, thank you. The District Court made three errors in this case. First, it erred when it ruled as a matter of law that Mr. Carroll was covered by qualified immunity. Second, it erred when it held that Tresona had no standing relying on the Cybersound case because the Cybersound case, unless it was subsequently fixed by Carbello, as some commentators have said, contradicts the 1976 Copyright Act that gives joint copyright owners the same rights to license their work as sole copyright owners. Stop there for a second. Let's assume the case is incorrectly decided. We can't say that. And an en banc panel of this Court could say that, but we lack the power to overrule a prior decision, just as the subsequent decision you cite lacked the power to overrule a prior decision. So I'm not sure this is an argument that you might want to address in a petition for a hearing en banc if you don't prevail in this case, but we don't have the power to say a previous decision of this Court is overruled. That may be a step that needs to happen, but I think it's instructive to look at the language of Carbello as it has been interpreted. Well, but the problem is it's a great argument. It may be right. We don't have the power to accept it. We can't, since no one panel of this Court cannot overrule a previous panel's decision, whether or not that language is inconsistent, whether or not the two are irreconcilable is something for the en banc Court. It's not for us. Well, what this Court can do is recognize that the language in Carbello that interpreted CyberSound interpreted it in a way to confirm that the original CyberSound decision would not do violence to the 1976 Copyright Act. This Court can go back, review those two decisions, and determine that the consistent ruling of the Court as it should be interpreted, contrary to the way that it was interpreted by the district court, is that the 1976 Copyright Act's plain language must be followed. Well, but here's my problem. Doesn't CyberSound, is that how we pronounce it? Yes. Doesn't CyberSound say to the contrary? Doesn't CyberSound say that you must have all the owners of the copyright to enforce it? Yes? That's certainly how it was interpreted by the district court. Well, not only how it was interpreted, that's what it says, isn't it? Doesn't it? It does say that. Okay. You're asking us to say it's no longer good law. No. I'm asking you to say that when the Carbello Court looked at it and interpreted it with respect to the 1976 Act, that the analysis of the issue in the CyberSound case was so brief and referred so succinctly and without explanation to the word exclusive that there's no way to interpret that exclusivity concept. So you're saying that Carbello overruled CyberSound on this point? Well, Your Honor, I understand what you're saying, but our position is that it determined that the CyberSound language could be interpreted in a way that was consistent with the 1976 Act. Otherwise, the Carbello Court would have said this is inconsistent, we need to kick this to an on-bank review or something to that effect. One of the issues in this case is consistency in the industry with respect to copyright, and it's important, I think, that the commentators have said that what happened in Carbello was that this Court held that exclusive and copyright statutes cannot mean that only sole owners possess exclusive rights, as such a rule would run directly contrary to another well-settled principle of copyright law, the right of co-owners to sue third-party infringers without joining fellow co-owners. Now, Nimmer says, the commentator says that this statement is a revolution by redefinition that defangs the harmful results that CyberSound wrought. Well, Nimmer isn't always correct. That's unquestionably true. Mel Nimmer was my professor in law school, but now it's being written by other people, so it's not necessarily correct interpretation of our law. That's unquestionably true. I think that I cite it not as controlling law that's perfect, but as a point that knowledgeable understanders of copyright law have looked at this as a way that the problem CyberSound caused. I think it's a misunderstanding of copyright law, actually. And I think the misunderstanding comes from the list of exclusive rights in Section 106, and then using this word exclusive to also apply to the nature of a license that can be granted, and also in the sense of conferring standing to sue. Well, all I can say is that the language under Sections 101 through 106 do refer to the fact that a beneficial owner of a copyright, which would include an exclusive licensee, does have the right to enforce the copyright. Right, but your client is not an exclusive licensee. Actually, we are an exclusive licensee. No, you're not because you don't own the entire interest. You don't own the entire bundle of rights in the copyright because you were only transferred that portion that belonged to the joint owner. Well, that issue is addressed in the Minden case. This court has determined in the Minden case that where you have a sole copyright owner who has an exclusive licensee, in that case it was a photography company that had photographs, and the exclusive licensing agent, exclusive licensee, was held to have the authority to bring an independent copyright action. That was in the Minden case at pages 999 through 1000. That's important because if we assume then, as we must, that the plain statutory language of the 1970s But your client isn't an exclusive licensee. It's an exclusive licensee in the same way that the licensee in Minden was, and this court found that the exclusive licensee in Minden had the authority to bring a copyright act. All the individual owners had granted an exclusive license to Minden, and here you have fewer than all of the individual owners who granted a right to your client. Right, but if we take the Minden principle and we apply it to the 1976 Copyright Act, which says that co-owners should not have less rights than a sole owner, then the outcome is that the rule as it was applied by the district court is incorrect. I'm still stuck with this problem. The 1976 Copyright Act was in existence when CyberSound was decided, was it not? It was. CyberSound may have misread the 1976 Copyright Act, but it says only copyright owners and exclusive licensees may enforce a copyright. Your client doesn't fit in either of those categories, does it? Well, I've answered that question the best I can with record. You see, I understand your dissatisfaction. I understand NIMR's dissatisfaction with CyberSound, and maybe an embanked court should deal with it, but Corbello doesn't overrule CyberSound. It may have language in it that's inconsistent with it, but it doesn't overrule it. So for purposes of today's argument, why don't you assume you're stuck with CyberSound? Very well. And doesn't that dispose of three of the claims? It disposes of some of our claims, that's true. It disposes of our claims with respect to three of the songs, but not Magic. Can I ask you a background question? Certainly. I'm trying to understand the nature of your business, that is, how you make money. It wasn't entirely clear to me. Okay. So what do you do to make a living? Songwriters hire us in order to handle their licensing and enforce their copyrights. One of the problems with CyberSound is that, for example, if Simon writes a song under Minden, Simon can hire an exclusive licensee to go and enforce his rights. If Simon and Garfunkel write a song together, Simon's exclusive licensee under CyberSound, unless we look at it as having been fixed by them. If it's Simon and Garfunkel, Simon can't grant an exclusive license because Garfunkel still has co-ownership, and Garfunkel didn't acquiesce in the grant of that license. Therefore, it's not exclusive. And yet that assertion, Your Honor, I would respectfully suggest is contrary to the 1976 Act, which says that a joint owner must have the same rights as a sole owner. They do have the same rights. They have an undivided interest. It's like joint tenancy, an undivided interest in each of the exclusive rights listed in the Act. But they wouldn't each have the right to assign their rights to an exclusive licensee. Right, they don't because it needs both of them to make it exclusive. And again, I can only repeat what I said before, which is that we believe that assertion is contrary to the clear language in the 1976 Act, which says that a joint owner should not be prevented from enforcing his or her copyrights. Where does the 1976 Act say that? Well, forgive me, I don't have the language of the 1976 Act in front of me. But it is intended, and there is a lot of language in our brief to the effect of the language that's specifically in it, as well as the legislative history dictating then the intent of the Act was specifically to fix this problem. Well, yes, to address the question of divisibility of copyrights and copyright interests and a bundle of rights. But not divisibility in an abstract way, divisibility in a way that would protect the rights of the individual joint copyright owners. I would like to address the fair – Could I just go back? Of course. So you get a – you're hired by a songwriter to do what? We are hired by a songwriter to enforce their rights, to issue licenses. So we issue licenses to outfits such as show choirs, school choirs, church choirs. And how do you get paid? They pay us. Who's the – the songwriters? Who pays you? The arrangers who create the arrangements, which are derivative works. They pay to Traysona, and we remit the money to the songwriters. And you get some money. Yes, we get a piece of it. And how much money was at stake in this case? Less than $2,000. This was a – And you brought it some four years after it was – the infringement allegedly took place. Is it worth that with respect to these schools? Well, we believe that it's important to enforce the rights of our licensors. We believe it is worth it. In this case, we brought it not four years after we learned about it, but shortly after we learned about the infringement. No, no, I'm just indicating that four years had gone by. They weren't continually violating the copyright. That they weren't what? Weren't continually violating your clients, in quotes. Oh, I see what you're saying. Well, they probably were, but those violations are not at issue in this case. A corollary or maybe the mirror image to that is that, as the record reflects, these outfits spent hundreds of thousands of dollars a year on professional licensing, on professional costuming, on a professional arranger to create these infringing arrangements, but didn't budget $2,000 to pay for the licensing for the music that they were using. I'd like to address, as the court – Are you trying to establish a principle of law here, other than you want Cybersound overruled? Well, the five-cent answer to that is, no, I just want to win. We're not here trying to make new law or anything. We're trying to point out that the – I mean, it would help your business if we issued a ruling saying that all schools have to obtain a license to use any snippet of music from a song, right? Well, as nice as – perhaps that would be for the music industry. We're not here to argue that. Okay. First of all, this – we're not arguing that this – is actually a fair use. Well, that would be something that the district court did not decide. But we asked you to address it in a supplemental order. I'm prepared to do that. All right. One of the things that is very clear about fair use is that it's fact-intensive and, again, that the district court never ruled on this issue. The only relevant aspect of fair use that did come up in the lower court was the fact that the trial court assumed that perhaps Mr. Carroll thought about fair use in the context of being reasonable because he was a teacher. But Mr. Carroll never argued that, and there's no evidence in the record. I know. I know. So you're saying if we were to go on fair use, if we were to rule as to fair use, we would have to remand to the district court for what facts are in dispute here as to magic? Sure. I'll talk about the four elements of fair use with respect to the facts that are not so much in dispute, but I think would justify a ruling by this court that, in this case, the fair use affirmative defense can't apply. Okay. So, I mean, I just want to know, are there facts in dispute? Because you've submitted, I don't know who submitted it, but someone submitted the CD of the performance that included magic so we can see for ourselves what portion of magic is in the entire show. And for the court's reference, that's in the magic rainmaker file, and it's a time stamp, 15 minutes, 30 seconds, through 17 minutes, 44 seconds. If the court reviews that, the court can see that this custom arrangement, for example, was not transformative. Now, I see that my time's up. I'm happy to continue answering your question. No, please address it, and your time's not up yet. It's yellow. Okay. So, first of all, the custom arrangement was not transformative because it was so similar. It used the exact same original words. It used two of the four original verses. It used the exact same melody. And it used the most important part of the infringed work, that is the chorus, as the most important part of the custom arrangement, that is the closer. That goes to the amount and substantiality of the portion used. Of course, the nature of the work is creative, and so one of the four elements is creative versus informational. That bears against fair use. And the purpose of the sheet music, that is one of the elements, is purpose and character of the work. In this case, the purpose of the sheet music was to train performers and have the professional backing band use it during the performance. So it's precisely what the intentional work was intended for. The most important factor of the four, as this court has recognized, is the effect on the potential market. And this court has stated that any use that supplants original use would ordinarily be considered an infringement. In this case, it's shown by the fact that Tresona issued four other custom arrangement licenses, allowing choirs to create custom arrangements for Magic, this very number. There's two school choirs, one show choir like this one, and one church choir. That's contained for the court's reference in Document 152 below at Exhibit 12. In addition, this market has existed for decades for rights holders and their exclusive licensees. There's an affidavit at Document 194, Exhibit 4, from an industry individual explaining how the district court's ruling would destroy the market for custom arrangements that's existed literally for decades. I'll leave it at that and reserve the remainder of my time unless there are further questions. Do we have any questions? No. Thank you. All right, thank you. Good morning, Your Honors. May it please the Court. Scott Danforth on behalf of Brett Carroll, defendant. I will be using 14 minutes and will be reserving the rest of the time for Mr. Bjorgum. So as counsel mentioned, this case involved originally four copyrights. Based upon the limitations that were identified in the plaintiff's reply, ultimately only two songs are at issue on this appeal, which is Magic and I've Had the Time of My Life. I thought it was only Magic. Your reading of their briefing is that they're giving up on the other two? Well, Your Honor, they cite a footnote on page 10 of their reply brief that indicates that the only issues on appeal here are related to the custom arrangement licenses, the derivative use, and the only songs that had a claim. So you're interpreting from something that doesn't say that, that they're only contesting two? Well, Your Honor, the footnote clearly states that they're only addressing derivative use, which is related to two of the copyrights according to their complaint. Well, they're only addressing it there, but I'll ask your opponent when he gets up. I thought they were maintaining a claim as to all four. They may have only been addressing it in that portion of their brief, but I don't see a concession that they're not making that claim anymore. Okay, Your Honor, I understand where you're coming from. My reading of their footnote 10 seems to suggest— Okay, it really doesn't matter. Right. Why didn't your client ever raise the fair use defense? Your Honor, in our motion for summary judgment, we do mention fair use and we do cite a case. You mentioned it below. You're up on appeal, and you don't say it doesn't matter. The district court should have ruled for us on the basis of fair use. Your Honor, that was just a judgment decision at the time of trial. I'm not suggesting it was malpractice. We're on appeal. We're on appeal. And one thing you could have said on appeal was this was fair use. And, Your Honor, I— And you didn't. What I did do in the brief on appeal is I indicate to the court that for purposes of this case, I think one of the primary issues is qualified immunity. And for purposes of analyzing qualified immunity on this appeal, fair use is applicable. There are two specific cases. Right, but if we were doing qualified immunity, and I want to get to that in a second, we would just have to decide whether the law was clearly established. And your argument is it's not. That it is. That's a little bit inconsistent. It's actually in the statute. It's clearly established law. So go from there. Well, Your Honor, the— The creation of derivative rights is definitely one of the exclusive rights of copyright. Well, Your Honor, one of the problems in this case is that Mr. Carroll did not create the arrangements in question. They were created by a third party who indicated to Mr. Carroll that they were ready to be used. And they were used as an educational tool for the class, the choir class. These students were given the material to learn so that they could learn— Wait a second. There's a lot of evidence in the record that Mr. Carroll knew—he asked the arranger to create the arrangement and that he was aware that somewhere out there there might be this issue of licensing. So there's a lot of evidence in the record that goes contrary to what you just said. Your Honor, I believe that the evidence does show that Mr. Carroll commissioned somebody to create an entire show. He did not dictate what songs were used or what songs should be put into this arrangement. And that arrangement was handed to him, and he was given permission to use that arrangement. Did he have any creative involvement in creating the show, the show that Magic was in, for example? I believe he had some creative involvement with regard to just how it was presented. Wasn't he even in it? He was in a portion of it, yes, but performing the arrangement that had been created. But he had something to do with creating the whole work, if it is a derivative work. Your Honor, he was part of it. He was not part of creating the actual derivative work. He was part of presenting it. But he hired the arranger to do that, right? Yes, Your Honor. Well, with regard to fair use, Your Honor, as late as 2018, there has been a dispute as to whether fair use would apply in the context similar to this, where a copyrighted work is being used in the context of an educational environment as a teaching tool. And in that 2018 district court case, the court found that there was no clearly established law related to fair use. That's the problem I have. So we're up on appeal on an issue that you didn't brief, an issue where you think the law is not clearly established. Why should we reach that issue, or should we? In other words, let's assume that we determine that with respect to this one, the Magic song, there's an issue of copyright infringement. You could have raised a fair use defense on appeal, but you don't. The law is unclear on it. So could we rule in your favor on fair use if you think the law is unclear? Well, Your Honor, I think for purposes of qualified immunity, it's unclear. You've asked us to look into the actual – So let's get back to qualified immunity, which is the question, I think. Why should we apply a qualified immunity analysis to this statute? There's no Ninth Circuit case doing so. Why would – if we apply qualified immunity, it would mean that President Trump, I think, could use born in the USA over the objections of Bruce Springsteen because the law is not clear. Why would that – why would we do that? Your Honor, well, I think the purpose behind qualified immunity is to give some leeway to these public officials. And I think it's been applied – Why should public officials have any leeway about expropriating the intellectual property rights of other folks? I understand in the 1983 stuff, where their daily job involves enforcing the laws, that we want to make sure that they're not deterred from enforcing the laws. But why should we worry about deterring federal officials from copyright violations? Well, Your Honor, in this case, what we're trying to do is we're trying to give a high school choir teacher some leeway in trying to teach his students in the best way that he can. Look, if you want my view of this lawsuit, it sounds to me like extortion, but that's not the issue in front of us. The question is qualified immunity. And so why would we apply a qualified immunity analysis to public officials or public employees who engage in copyright violations? I just might add that the Supreme Court has never held that qualified immunity applies in the copyright infringement context either. I understand there are some circuits that have gone there. I think they're way off base in applying qualified immunity to the copyright law. But that's just my opinion. I'm not speaking for anyone. But I don't even understand how this case came up on qualified immunity when you readily had a fair use defense. Well, Your Honor, because Anderson Creighton specifically identifies when qualified immunity applies, and it uses the broad language that qualified immunity applies any time there's a federal right at issue. Right. This isn't a federal right at issue in the sense of constitutional rights or individual rights or civil rights. This is a statutorily created and enacted doctrine that within itself, the way the whole act is structured and has been since copyright acts began, to accord varying liability for different types of infringement. There's already leeway in the statute, in other words, for innocent infringers or various levels of culpability. And, in fact, the reason the 1976 act added fair use is because courts had been reading into the act non-liability for certain settings, like teaching or educational uses or informative uses or transformative uses. And so Congress decided to enact all of those exceptions or diminutions of liability and that leeway into the fair use provision. Your Honor, if I could address the fair use argument, I will go into why I think that fair use doesn't apply. I don't know if we can go there, but I'd ask you to address it. Yes, Your Honor. Well, the first factor with regard to the purpose and character of the use, the original piece that's at issue here is the song magic. It's not a derivative work that was created by Traysona. It's that specific song. And that specific song was created with creative intent to essentially put on a show for individuals. It was not created for educational purposes. The way that the song was taken in this case and used by the choir director, Mr. Carroll, was specifically for educational purposes. It was taken as a tool to educate the students into identifying different styles and how to perform these types of different styles in a performance setting in front of an audience. With that said, I think that the work was also transformative in nature. I know that counsel had indicated he did not believe it was. But, again, not only was it transformed into an educational tool, but the specific themes and the purpose behind the song was completely different. The theme of the song was transformed into something that was unrelated to the intent of the original song. The original song was about trying to- So we're talking about, what work are we talking about? I apologize. Magic. We're talking about the show as a whole. Right. And magic had, the use of magic was a small part of the show. Correct. The show as a whole. It was approximately 20 seconds. They used approximately 20 seconds of the song, and they repeated that portion over and over again for a portion of the actual overall show. And that song, obviously, is several minutes long, and they used only a very small portion of that song. And they also sort of intermingled the use of that song with another song. So it wasn't even just straight magic being performed at that time. So with that said, I think that the use certainly was transformative, not only because it changed the song specifically, but it also transformed it into an educational tool for these students and how to perform these arrangements. With regard to the nature of the copyrighted work, admittedly, if looked at generally, both of the performances were creative in nature. But, again, I go back to the fact that the choir performance was educational. It was meant to be used to educate the students. And so I think that the actual use of the copyrighted work was not the same as the creation of the original work. Does it matter that admission was charged to performances? I don't think so, Your Honor. These students and Mr. Carroll were not being paid for this performance. Admission was to ultimately help fund the school, and it was in the context of a grander educational performance for family and friends. So if the proceeds had gone to the students to support their college education or something, would we have a different case? I think there would potentially be more of an argument, but I still think that the rest of the factors, Your Honor, would weigh in favor of fair use in this case. The Booster Club briefed this issue below. The district court didn't get to it because it found qualified immunity for everybody. Assuming we don't think the qualified immunity analysis is applicable, why wouldn't we just send it back to the district court to rule on that portion of the motion for summary judgment that it pre-permitted? Well, Your Honor, I think that the facts that are presented to the court enables this court to make a de novo decision based upon whether fair use applies in this case. It was raised. It was mentioned in the motion for summary judgment. It was mentioned in the briefing, and it wasn't really addressed by plaintiff's counsel in the briefing either. And I think that the facts weigh in favor of finding fair use in this case. Well, one reason they didn't address it is because you didn't raise it, to be fair. Right? I mean, they don't have to address an argument you're not raising. Well, Your Honor, I do go back to we did cite a specific case that found fair use could have applied in a similar context, an educational context, in our moving papers of the motion for summary judgment. In the district court, but not on appeal. Correct, and in our brief on appeal. It was a short section. Okay. And if we go to the third element, which is the amount and substantiality of the portion used, again, it was a very small portion of the song that was used. And, sure, it was part of the chorus that was repeated over and over again for a period of time. But, again, it was not re-performing this entire song. It wasn't even performed in the same way or context as the original piece was created. And, finally, the effect of the use upon the potential market, I don't think that there's any legitimate argument that this had any effect on the overall market. Well, but, I mean, that's the one where I think this is the closest prong of the fair use factors. Because if it was the role that every school would not have to get, regardless of how much they used of what song or whatever, did not have to get a license from the author, from the author's agent, it would take away that market and part of the potential profits that the artist could receive from the use of its work. Well, Your Honor, I don't think that it takes away... You see, if every school was able to do this, and I know that some schools, there's actually, like when they do a whole musical, they will get a license and it will be to perform the entire musical as a school performance. And that's a business that people profit in. How close is this to that? Well, Your Honor, to require a choir program who is putting together a show that incorporates a number of different songs to obtain a specific license for every snippet of a song that's potentially used in that performance would create a huge amount of money that they need to spend each year on these types of performances. They probably would scale down a lot of what they do. They're not performing the entire piece like in a play, for instance. If they're performing Cats, for instance, by the theater, they're performing the entire show. They're not performing a little snippet of that. Somebody is not going to go see the performance of Cats in a school instead of going to see the performance of Cats in Broadway play. No, your argument would be someone might, but no one's going to go see the performance of Magic, its snippet in your work, instead of buying the music itself and listening to the song. Yes, Your Honor, I apologize. I misstook. But that's what your argument is. Correct. Nobody is going to go see the choir performance of a 20-second portion of Magic and then not purchase the song of Magic or go see the live performance by Olivia Newton-John. And I think one really key factor here is, if anything, I think it would have had a positive impact on the market. These students were born after the 90s. This song was released in 1980. If anything, it was exposing students who never would have even heard this song before, probably, to a song that they potentially like, which would then allow them to go purchase the whole song or the whole CD or whatever the case may be. And I think that's the case with a lot of these choir performances. It's exposing these students to music and genres that they may not have otherwise come across. If you take away the school's ability to do that effectively by making them pay for all of this stuff, anything that could be potentially used in a choir program, and mind you, just because a song, strike that, they don't necessarily perform every song that they learn about in a choir program in the classroom. They perform specific ones that they think are good for the performance value. So if you're requiring a choir teacher to then obtain a license for every single song that's ever mentioned during the course of that class, if they go over it one day or multiple days for a performance, you're effectively going to cut down on what these students are going to be able to be exposed to. So does it matter that it's only a small portion? I'm trying to envision a choir performance where the choir says, tonight we'll be performing the songs of Artist X, and each of the choir singers sings one of the songs of Artist X in its complete version. Do you need to have a copyright license to do that? Well, Your Honor, I think it may make it a closer question, but again, I still think that the intended purpose is for this case. The fact that it's a closer question doesn't absolve you from answering it. Under those circumstances, do you think you need a license? Your Honor, that may fall under the same context of a play, for instance, as we were discussing before. Well, because that goes to number three, the amount and substantiality of the portion used in relation to the copyrighted work as a whole. Correct. So I think it would be more along the lines of doing a complete play. Did you want to give your co-counsel a chance? Could I ask you a quick question about going to counsel fees? Is there anything in the record that indicates how much you've expended, you and your co-counsel, co-defendants have expended on counsel fees? Yes, Your Honor. We did identify all of them. The number 200,000 sticks in my mind, but I don't remember where I saw it. I don't remember what the exact number is, Your Honor. I can locate it, but I know that it's in our briefing, and I know that we do attach the actual fee documents to our briefing. Good morning, Your Honors. Eric Bjorgen, may it please the Court if I could. I hope you're not going to need all those papers. No, no, I'm just a little nervous. I'll address a couple of arguments that the Court brought up. First, the Court can review fair use without on-summary judgment. That would be Worldwide Church of God, 227F3rd. We can, and just so that I'm clear, you raised it, the Booster Club, if I can call you that. Yeah, I did. You raised it as to all four works. No, at the time, I'm not sure if I did all four, no. But at least as to magic? Yes. The way this worked was Mr. Carroll got out of the case first in December. Judge Wilson sets a six-month period to go to trial. So I started getting ready for trial, and he strongly hinted fair use in his SJ. So these guys were clearly on notice about that. So my first argument was fair use. My second argument was vicarious infringement. In January, Judge Wilson decides fair use is fact-intensive, grants the motion on vicarious infringement, because we're like three days before trial. Right, right. So he didn't decide it on qualified immunity with respect to the Booster Club? The Booster Club is not qualified immunity. It's vicarious infringement. These are volunteer parents. Right. And their spouses who are getting sued, not just here, but in Arizona under a tort for interfering with contract. That would make every single copyright defendant be liable for interference with contract. That's ridiculous. I mean, this, as Your Honor said, this was extortion. And I'm dealing with parents and their spouses who just showed up to their kid's thing. Well, and as to your client's involvement in this case, I'm mystified. I'm not mystified as to Mr. Carroll, who's arguably infringing a copyright. I'm just completely mystified as to your client's involvement in this case. As were we, Your Honor. And so the fair use issue could be resolved on summary judgment. But vicarious liability was resolved. Was resolved. And if we were to affirm that, we wouldn't have to reach any other issue as to your client. No, although I know the copyright community was very interested in the fair use issue. It was brought up. This court brought it up Friday. If plaintiffs wanted to bring it up or get further briefing, they could have filed something on Friday. And as this court knows. Well, we didn't ask them to file anything. We just asked them to be prepared to address it. But they could have asked. It's very important to their business. And this court has discretionary power to consider everything that goes on below. And the notice of appeal was from the entire judgment. I agree. I think suing the Booster Club was kind of overkill. And the parents and their spouses. So does the record reflect your fees incurred in this case? Yes. So my fees were, I think, quite reasonable by the time. Of course they were. Well, they were. Every lawyer says that. But could you just tell us what the amount was? My amount was approximately $137,000 to take them all the way to just before trial. The plaintiffs let out the parents themselves just before that. I objected under Rule 41 that you can't dismiss a party that late without paying fees. But Judge Wilson didn't agree. And so at the very end, it was just the Boosters Club that was left days before trial, wondering why they were in this case. Can I ask you about the Arizona case? Sure. Were those two cases going on at the same time? Well, initially, Traysona sued everyone in Arizona in federal court. We moved to transfer or dismiss. The court dismissed. They sued everyone here, stalked everyone. But was there a state court action? Yeah. So then the state court action was filed in Arizona after the federal court action was dismissed. So they refiled the state court action. An Arizona firm took that over. I think it was the Arizona Lewis-Brisbois office. I think the judge asked for fee briefing. I'm not sure what happened, but the judge dismissed that case as well. Can I ask you a question? You said fair use was of interest to the copyright community. What do you base that on? Josh Green, who is the arranger, his lawyer, had told me, you know, everyone's looking at this fair use question on this case because the number of people who have been sued by these guys, within weeks I was flown to Minnesota to speak to a choir group, a huge group about what to do. And so people want to know what's going to happen with Traysona. They're in a lot of uncertainty. They sued for 80 copyrights, 150,000 statutory damages. This was not $2,000 at issue in this case, okay? Maybe at the end that's what was left, but that was after a lot of work, and there's a lot of people out there who want to know what to do. For $500, if they can get a law firm, I know one, to do an opinion on fair use, that would be a lot cheaper than paying Traysona. I want to just go back to your clients for a moment. The basis for their fee request is the Copyright Act? Oh, that's right. Right? Yes. It's the only basis you made below? That's right, correct. You didn't make a frivolous lawsuit argument or anything like that? No. Why are you entitled to fees under the Copyright Act? Tell me, given the language of the Act, why are you entitled to fees? Well, yeah, the language is that we obtained good results, obviously, for our clients. They were all let out. The other side argues that that didn't go to the purposes of the Copyright Act, but I would assert that defining the contours of vicarious infringement goes to the purposes of the Copyright Act. And so your argument would be the same even if we were to find, for example, that Mr. Carroll violated the copyright of Traysona? Yeah. Mr. Carroll. It doesn't matter to you whether there was a copyright violation or not. You're not the kind of people that ought to be sued. I don't want to go that far. Well, but your argument's not dependent on the validity of their copyright claims against Mr. Carroll, is it? No, unless the court were to address substantial similarity. But we believe we can't be liable under vicarious infringement. Yeah, that's my point. My point is that you're saying we didn't do the kinds of things that would make us liable for vicarious infringement even if there were infringement. We certainly weren't direct infringers, and, yes, that's correct, Your Honor. We didn't order the work to be created. If I could just add one thing on the fair use issue as well. It was highly transformative. It was a pop song. The original was a pop song that lasts a couple minutes. This took an entire story about a man coming to a town and weaved it together into a whole new narrative using the chorus of a Louis and Newton John song interspersed with Barry Manilow's song. If that's not creative, I don't know what is. That's the kind of thing that should be encouraged. It should be encouraged that public schools have the money to put on professional performances. It's no coincidence that Burbank was targeted as the school that Glee was based upon. If Burbank followed suit, everyone followed suit. They didn't necessarily want a lot of money, but they wanted a press release that Burbank paid because they're the ones who have the money to fight this. Was Mr. Carroll an employee of the school district? Yes. Even though he was a part-timer sometimes? I'm not sure about his status, but he was never part of the Boosters Club. That's a typical 501c3. That's right. With respect to you, it's not the school district. I'm asking about the Boosters Club. That's correct, and I would say that the last factor for fees, the deterrence factor in this case, weighs heavily in our clients' favor because we want a trace owner to think twice before they sue, not sue first and ask questions later. Hopefully we can send them a message. Hopefully everyone can receive protection for their works without this sort of thing happening, and an award of fees would help send a message that this is not a zero-sum game for them. That's my argument, if you have any other questions. All right. Thank you. Thank you, Your Honor. I think you had some time left. Thank you, Your Honor. First I'd like to address a couple ways in which I think the district court clearly did not abuse its discretion in deciding not to grant attorneys' fees here. One of the things that hasn't been brought up is that neither the Boosters Club nor the board members, nor Mr. Carroll, paid their own attorneys' fees. They were all paid by third-party payers, and that's reflected in our briefing. And Mr. Carroll was, in fact. Does that preclude the award? It doesn't preclude it, but it's a factor that I believe the district court took into account when it exercised its discretion not to award fees. Who did pay it? I'm sorry? Who did pay it? Well, we know that Mr. Carroll's fees were paid by an insurance company. The Boosters Club declined to say. Could I ask you a question? In their brief, one of the things they say, in terms of your animus, is that after summary judgment, I'm looking at page 22, that after summary judgment was granted, you sent a complaint to the Burbank School District and various state and federal agencies, quoting Mr. Carroll's private text messages obtained in discovery during the California case, which were timely designated as confidential for counsel only, and attaching hundreds of pages of these confidential text messages, some of which contained the personal information of minors in an effort to ruin Mr. Carroll's reputation. Mr. Greenberg then publicized his actions by, again, going to the media to promote the complaint against Mr. Carroll. Tellingly, Mr. Greenberg's personal complaints were ultimately dismissed against Mr. Carroll. Did you do all that? Well, what happened was, in the course of discovery, we determined that there were text messages in which Mr. Carroll addressed students in a sexual manner, described them in a racial manner, and Mr. Greenberg did make a statutorily protected complaint to the school district so that they could take whatever action they thought was appropriate. The messages were exceedingly egregious, sexual and racial, and a lot of abnormal sexual issues were pointed out, even with respect to students. This was not specifically relevant to the lawsuit. It was made as a separate complaint to the school district because there was very legitimate concerns if those documents are read with respect to Mr. Carroll remaining. And that's why you released them to the media as well? They weren't released to the media. That's what it says. Mr. Greenberg then publicized his actions. I'm reading from 23 of the complaint. Mr. Greenberg then publicized his actions by, again, going to the media to promote the complaint against Mr. Carroll, which, by the way, were ultimately dismissed. They were ultimately dismissed. Did you go to the media? Did you make those complaints public? Mr. Greenberg did speak to the media about the concerns. About those complaints? About the fact that a complaint had been made. And did he say what the complaint was? I don't have a specific recollection of what exactly was said. Part of the problem with this case was that when the documents were disclosed, the opposing counsel improperly designated all the documents after the fact as attorney's eyes only, even documents, for example, that were addressed. Right, but the remedy for that is to go to the court and ask them to unseal. Unfortunately, at that point, the case was resolved or the case had been finally entered. You'd still go to the court and ask for it. I mean, if there's a court order putting it under seal, under a protective order, you have to go to the court. You can't just reveal it to the media. I want to be clear about the timing here. At the time that the documents were shared within the complaint, they had not been marked confidential. They were not marked confidential by the opposing side until after the complaint was filed. Once Mr. Carroll got word of the fact that his improper communications were the subject of a complaint, then his lawyers went back and tried to retroactively mark everything as attorney's eyes only. They were not marked confidential when they were shared, and at no time after they were marked confidential were they ever shared or ever discussed with anyone. I want to make sure that that's perfectly clear. And I think it's worth pointing out. And why was it done? How did it further your copyright action? It didn't at all. It was done because of the concerns with respect to these text messages that were discussing students in a sexual and racial environment. Whose concerns? Mr. Greenberg's concerns. Mr. Greenberg's relationship to the students was what? Well, he didn't have a personal relationship to the students. What was Mr. Greenberg's relationship to this lawsuit? He was one of the principals of Trisono Multimedia. He had access when he saw the. So this was done, I think we could reasonably infer, to further his interest in recovering in this lawsuit, was it not? Well, if you were to infer that, it would be to infer it without any evidence in the record to that effect. Is there any evidence to the contrary? Well, yes, the fact that the messages are so egregious. Now, that's what you're saying is that the release of the messages themselves must have been for a non-ulterior purpose because look at the messages. The only release of the messages was with respect to the complaint that was filed with the school district. By whom? Mr. Greenberg. Okay. Wait, Mr. Greenberg, he's the one who demanded the license from Carroll, right? That's right. He works for Trisono. What exactly is his position with Trisono? He's the principal. I don't recall if it's a managing director or owner. Does he own it?  Does he own Trisono? Yes. Okay, you could have just said he owns Trisono. He's your client. I'm sorry, you were asking? He's your client. Yes, he's my client for sure. I think it's worth pointing out also that Trisono is not a copyright troll that acquires copyrights for purposes of infringement. We work with Sony. We work with all the big publishers, Hal Leonard. The great majority of the publishing firms that issue custom arrangement licenses do it through Trisono. And we are not here to wreck the industry. We are here to make sure that people pay for the music that they're using. What is the basis of your claim against the Booster Club? Well, first of all, Mr. Carroll was acting as agent for the Booster Club when he did these things. We know from excerpt of record, page 569, that when the Booster Club board members, the defendants here, had questions about licensing, they went to Mr. Carroll and they entrusted him with that duty. Why does it make them their agent for purposes of this? They were worried that somebody might sue them correctly, I guess, because you did. And they said to Mr. Carroll, are you getting us in any trouble? And he said no. Why does that make them vicariously liable for anything that he did? Well, they're vicariously liable specifically for two reasons, the two factors under vicarious liability, which is a financial interest, which they clearly had because they were doing a fundraiser where these numbers were shown. It's not a coincidence that they picked popular, noticeable songs for these fundraisers. And the second issue is that they had the ability to control this from not happening. They could have told Mr. Carroll at any time, hey, don't commission infringing licenses. They could have said, at our fundraisers, the bands may not use infringing sheet music. They could have said, Mr. Carroll, you're not authorized to make sheet music, as he admits he did. And you sued the Booster Club as an entity and individual parents that were members of the club? That's right. They were all liable for alleging 18 copyright violations. I don't recall how many were originally alleged. The one that's still at issue for sure is Magic. And the reason that the copyright individual defendants got dismissed was not based on a substantive copyright legal issue. It was based upon the fact that Magic was performed in 2013, and the board members had not been on the board since 2011. So there was not a determination that was substantive with respect to them. It was a determination that, oh, well, now that Magic is the only song that survives after we apply the cyber sound rule, these individuals need to be out because they weren't around during the time that Magic was performed. I see that my time is over, but if there are any additional questions, I'm happy to answer them. Thank you very much, Counsel. Tristana Multimedia v. Burbank High School is submitted, and this session of the court is adjourned for today. All rise.
judges: Wardlaw, Hurwitz, Korman